UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---------------------------------------------------------x
:
LAMAR WOODHOUSE : 3: 16 CV 726 (RMS)
:
v. :
:
L. VALLIN ET AL. : DATE: SEPTEMBER 28, 2019
:
:
---------------------------------------------------------x

MEMORANDUM OF DECISION

The plaintiff Lamar Woodhouse, incarcerated and *pro se*, commenced this action against New Haven Police Officers Gregory Pellicone,[1] Lars Vallin and Eric Pesino, in their individual personal capacities, alleging excessive force under the Fourth Amendment. (Doc. No. 1; *see* Doc. No. 8 (dismissing New Haven Police Department as a defendant)). On June 5, 2018, the parties filed a Notice of Consent (Doc. No. 35), and on August 30, 2018, this case was transferred to Magistrate Judge Donna F. Martinez for trial. (Doc. No. 41). On September 28, 2018, Judge Martinez granted the plaintiff's Motion to Appoint Counsel (Doc. No. 43), and *pro bono* counsel was appointed on October 3, 2018. (Doc. No. 44). On June 20, 2019, this case was transferred to this Magistrate Judge. (Doc. No. 70). A bench trial was held before the undersigned on September 11, 2019; the plaintiff and defendants Vallin and Pesino testified. (Doc. No. 88). On September 20, 2019, the parties filed post-trial briefs. (Doc Nos. 92-93; *see also* Doc. Nos. 94-95).

For the reasons set forth below, judgment shall enter in favor of the <u>defendants Lars Vallin and Eric Pesino.</u>

---

[1] On September 28, 2018, the Court (Martinez, J.) granted defendant Pellicone's Motion for Summary Judgment (Doc. No. 42) and dismissed him as a party.

1

I.  FACTUAL FINDINGS

Based on the entire record developed during trial, comprised of credible testimony and admitted exhibits, the following constitutes the Court's findings of fact pursuant to Fed. R. Civ. P. 52(a)(1):

The plaintiff is incarcerated in Osborn, Connecticut at Osborn Correctional. Defendants Vallin and Pesino were police officers with the New Haven Police Department at the time of this incident.

The plaintiff grew up in New Haven, Connecticut. From 2000 to 20002, when he was 18 to 20 years old, he dated Leila Sanchez while he was a student at Housatonic Community College. During those two years, the plaintiff met Ms. Sanchez's mother, Maribel Rivera. From 2010 to 2013, the plaintiff was in living in Georgia, songwriting "in the music industry." He moved back to New Haven in October 2013 after his "career tanked," and he was "kicked out of Georgia" for a violation of probation.

In November 2014, the plaintiff was "basically homeless," living out of his van in New Haven. As the plaintiff explained it, from 2013 to 2014, he was drug dependent, "basically in the street" using phencyclidine ["PCP"] and cocaine.

On November 21, 2014, the plaintiff was hanging out at the Best Gas gas station on Whalley Avenue, near Sherman Road. The plaintiff was with Aeyisha Wright; he met up with Ms. Wright at the gas station to hang out. About thirty minutes after the plaintiff and Ms. Wright met up, the plaintiff's ex-girlfriend, Ms. Sanchez, drove into the gas station lot. Since returning to Connecticut, the plaintiff had seen Ms. Sanchez at Edgewood Park with her boyfriend occasionally, so he recognized her when she pulled in, but on that night, he noticed that her face was swollen. Ms. Sanchez told the plaintiff that her boyfriend had beat her up and that she had

2

come to the gas station to buy cigarettes but realized she left her purse, with her money, at her house. Ms. Sanchez asked the plaintiff and Ms. Wright if they wanted to come back to her house with her to get her purse; she claimed that her boyfriend who had abused her might be there.

The plaintiff, Ms. Sanchez and Ms. Wright rode in Ms. Sanchez's car down the street to Ms. Sanchez's house at 65 Blake Street. Ms. Sanchez told the plaintiff that 65 Blake Street was her house, and her mother, Ms. Rivera, had a bedroom on the second floor where she stayed with Ms. Sanchez's children. While they rode to the house, they discussed calling the plaintiff's "weed guy" to purchase some weed since Ms. Sanchez had money at the house.

When they arrived at the house, Ms. Sanchez pulled into the driveway, and they all got out of the car and approached the front door. Ms. Sanchez did not have her house keys because she had left her purse inside the house. Ms. Sanchez rang the doorbell repeatedly. Ms. Rivera, Ms. Sanchez's mother, could see the three of them at the front door, and, speaking out of a window on the second floor, she told Ms. Sanchez that if she did not have her key, she was not coming inside the house. Ms. Sanchez then forced entry by kicking in the front door. The three of them then proceeded up the stairs, but the door at the top of the stairs was locked. At that point, Ms. Sanchez told the plaintiff and Ms. Wright that the back door was open so they could enter through that door instead.

The plaintiff, Ms. Sanchez and Ms. Wright went around the house, entered from the back door and proceeded up a flight of stairs to the second-floor landing, and then up a second flight of stairs to Ms. Sanchez's third-floor attic apartment. There was no door leading into the second floor living area, just a door frame, so, as they proceeded up the stairs, Ms. Rivera could see them in the stairwell.

Once the three of them reached the attic, Ms. Sanchez retrieved her purse and they discussed who would call the "weed guy." At that point, the plaintiff heard police sirens and saw Ms. Rivera running outside. It was a span of approximately three to five minutes from the time the plaintiff, Ms. Sanchez and Ms. Wright arrived at Ms. Sanchez's house, until the police arrived at the house.

Ms. Sanchez went downstairs through the second floor, used the front staircase and confronted the police to explain to them that this was her house. The plaintiff and Ms. Wright wanted to leave, so they decided to walk down the rear stairwell they had just used to enter the third-floor apartment.

Officer Gregory Pellicone was the first officer on the scene and, as such, was the lead investigating officer; all of the other officers who arrived thereafter were cover officers, providing assistance to the Officer Pellicone. (*See* Pl.'s Ex. 17 at 8). When Officer Eric Pesino arrived, he noticed several officers on the premises, and damage to one of the doors. (*See* Pl.'s Ex. 17 at 18). The officers were responding to a call of a burglary in progress.

Officer Lars Vallin arrived with his police K-9, Xander. Xander is a Dutch Shepard; he was Officer Vallin's personal dog who he began training as a K-9 approximately seven years before this incident in question. Officer Vallin and Xander were often called to crimes in progress, such as in this case, which involved a burglary in progress, or to cases in which a suspect was fleeing or a weapon was involved. (Pl.'s Ex. at 7).

When he arrived, Officer Vallin believed that the situation was "not as elevated anymore" because the officers on scene informed him that they had already apprehended someone. As he was preparing to leave, Ms. Rivera approached him and was "very upset" and "agitated[]"; she told him that there was a male still inside her house. She was "extremely fearful and very adamant"

4

that Officer Vallin not leave the scene. (*See* Pl.'s Ex. 18 at 16-17). In light of the Ms. Rivera's demeanor, Office Vallin had "every reason to believe there was someone hiding" inside the house.[2] He viewed her report as "very concerning because [then the officers] don't know if – why, in fact, this person might be hiding, whether they're armed or not, so it's definitely an officer safety issue." (Pl.'s Ex. 18 at 17). The only information Officer Vallin had about the individual was that he was "male," was an "unknown burglary suspect" and was hiding somewhere on the second floor. (Pl.'s Ex. 18 at 21).

Officer Vallin called out to the other officers that he was going to the second floor to search for someone whom he was told was hiding. When a K-9 is used at a burglary in progress call, the general practice varies from one handler to another; the dog can be sent in alone, or with his handler. (Pl.'s Ex. at 12). Officer Vallin explained that his practice was to keep his K-9 within his sight at all times; he would keep him on his leash if he was not certain if there were officers or other individuals in the house who could come into contact with the K-9. (Pl.'s Ex. at 13-14).

Officer Vallin entered the second floor with Xander on his leash. As he moved close to the kitchen area, Officer Vallin gave an announcement that there was a dog on the premises, and that the dog would be used to search the dwelling. If anyone was hiding, the announcement was intended to give the person every opportunity to come out voluntarily. (Pl.'s Ex. 18 at 14; *see also* Pl.'s Ex. 9 (General Order 452.4(D) ("Unless it would otherwise increase the risk of injury or escape, a clearly audible warning to announce that a patrol K-9 dog will be released if the person

---

[2] There is inconsistent evidence, testimonial and documentary, about whether Ms. Rivera approached Officer Vallin outside, or inside the house, and whether Ms. Rivera was with Officer Vallin when she pointed at the plaintiff, or whether she pointed in the general direction of the second floor before she proceeded back down the front stairs to safety. Officer Vallin testified that his memory of the events was stronger at the time he wrote his police report than at trial, five years later. In his police report, he stated that Ms. Rivera followed him to the kitchen of the second-floor apartment, where she pointed to where the plaintiff was hiding. (Pl. Ex. 1-A). This is consistent with the plaintiff's recollection that he encountered Ms. Rivera and Officer Vallin when he reached the second floor and that Ms. Rivera directed Officer Vallin to his location. It is consistent also with Officer Pellicone's report. (Pl.'s Ex. 6).

5

does not come forth, shall be made prior to releasing a police service dog.")). Officer Vallin made this announcement as soon as he reached this second floor area because "exigent circumstances" existed in that he did "not know exactly where [the person] may be in the house, and [he did] not know[] if they ha[d] access to exit the house[.]" (Pl.'s Ex. 18 at 19).

After he gave the announcement, he saw the plaintiff appear, either from behind a door, or from behind a door frame. As the plaintiff testified, Officer Vallin saw him when he was in the "back hallway." Officer Vallin acknowledged that he saw the plaintiff emerge from some type of doorway opening, and he could not recall if it was the back hallway. (*See* Pl.'s Ex. 18 at 24 ("then a door, I believe it was a closet, flung open, and a male came out, and he looked at me, and I told him to get on the ground.")). At that point, Officer Vallin ordered him to get on the ground. The plaintiff described Officer Vallin's commands as "screaming" at him to get to the ground. The plaintiff testified that he put his hands up and was starting to comply. Officer Vallin testified that the plaintiff did not comply, so Officer Vallin again ordered the plaintiff to get on the ground. The plaintiff, however, did not comply but instead, looked towards the rear stairwell area and made a sudden move to run toward that stairwell. (*See* Pl.'s Ex. 18 at 27). At that moment, Officer Vallin, believing the plaintiff to be a burglary suspect, was concerned that, if he made it into the back stairwell, he would be able to flee the home. Officer Vallin was also concerned that, if there was an officer in the stairwell, and he released the dog into the stairwell, he would put that officer in danger. Officer Vallin made the "split second decision to release the dog." (*See* Pl.'s Ex. 18 at 27).

As he released Xander, Officer Vallin uttered the German command, "packen," which is the signal for Xander to apprehend a suspect. (Pl.'s Ex. 18 at 9-10, 28). In light of the split-second decision, Officer Vallin did not have the time to release Xander's leash from the collar. He just

6

dropped the leash and let the dog respond to the command. Xander reached the plaintiff before the plaintiff reached the stairwell and physically took hold of the plaintiff by biting him in the buttocks.

Xander acted exactly as Officer Vallin expected. After he issued the command and released the dog, the dog bit the suspect to "apprehend" him. (Pl.'s Ex. 18 at 29). In this case, Xander apprehended the plaintiff immediately; he held his bite for approximately three seconds. Officer Vallin explained that Xander was trained to bite arms and the back/buttocks area if a suspect is fleeing (Pl.'s Ex. at 32); he was not taught to bite legs.

The plaintiff was in an upright position, fleeing when Xander apprehended him and, "almost immediately," Officer Pesino appeared; "the dog ha[d] already apprehended [the plaintiff][,]" meaning that the dog had already bitten the plaintiff. (Pl.'s Ex. 17 at 27). As Officer Pesino described it, he was involved "at the tail end of [the incident] while placing [the plaintiff] in handcuffs." (Pl.'s Ex. 17 at 27).

Officer Pesino testified at the trial, and at his deposition, that he did not recall seeing the dog at all (Pl.'s Ex. 17 at 16), but that if there was a K-9 actively engaging a suspect, he would not get in the middle of the dog and the subject. Although he testified at trial that he could not recall whether the dog was present when he arrived to handcuff the plaintiff, at his deposition, he acknowledged that the dog had already apprehended the plaintiff and that he had arrived at the "tail end of it" to apply the handcuffs and force the plaintiff to the ground. He took hold of the plaintiff, placing him in handcuffs and detaining him. (*See* Pl.'s Ex. 17 at 21; Pl.'s Ex. 1-A ("Xander grabbed hold of Mr. Woodhouse's right buttock. At this time [Officer] Pessino [sic] appeared and took hold of Mr. Woodhouse."); *see also* Pl.'s Ex. 10 at 7 ("the police K-9 apprehended the plaintiff. Officer Pesino then appeared and took hold of plaintiff[.]")).

Officer Vallin testified that, as soon as Officer Pesino took hold of the plaintiff, he called Xander back with another command. (*See also* Pl.'s Ex. 18 at 33 ("As soon as the officer began to handcuff him, I immediately commanded Xander to let go.")). He explained that he would not allow Xander to bite if there were officers immediately present, unless he believed the suspect was armed. But, if the officers were trying to handcuff a suspect, he would not have the dog continue to "apprehend" the suspect because the dog cannot distinguish between police officers and civilians. As Vallin testified, these events occurred in a "very quick three seconds or so."

After the plaintiff was apprehended, Officer Vallin called for a supervisor and for the EMS to come "view the [plaintiff] and determine if hospital treatment was needed or not." (Pl.'s Ex. 18 at 36). The plaintiff arrived at the Emergency Department of Yale New Haven Hospital at 1:37 a.m. on November 21, 2014. (Pl.'s Ex. 19 at 2).

The medical records reflect that the plaintiff presented with a "PMH [past medical history]" of "psychosis, substance abuse – last smoked crack & used PCP at 7:30 pm, BRB [bright red blood] EMS s/p [status post] dog bite to R buttocks by police dog." (Pl.'s Ex. 19 at 2). The medical history was "provided by the patient and medical records" and was limited by the "condition of the plaintiff." (Pl.'s Ex. 19 at 2). No police officer spoke to any medical staff with information about the plaintiff's drug use that evening. The pain was "mild[,]" and the abrasions were "superficial" with "no puncture wounds." (Pl.'s Ex. 19 at 2-3; *see* Pl.'s Ex. 22-A). The plaintiff had "several linear abrasions to the right buttock area. Each one [was] several cm in length but superficial, not bleeding." (Pl.'s Ex. 19 at 4; *see* Pl.'s Ex. 22-A (photograph)). There were no noted injuries to the plaintiff's legs. (Pl.'s Ex. 19). He was "initially somnolent, [and] placed on [a] sobriety hold." (Pl.'s Ex. 19 at 3; *see* Pl.'s Ex. 22-A (photographs of the plaintiff appearing to be asleep)). Upon reevaluation, Dr. Jessica Singh noted that the plaintiff had an "altered mental

8

status due to substance abuse[,]" and that he was "somewhat somnolent, but arousable to voice."
(Pl.'s Ex. 19 at 3). Part of the plan of care included: "Intoxication, observe and re-evaluate for
sobriety and safe discharge. Patient observed for over [four] hours in the [Emergency Department],
until he was clinically sober." (Pl.'s Ex. 19 at 3-4). Upon discharge, the plaintiff's diagnoses were
"[d]og bite[,]" PCP (phencyclidine) abuse and [c]ocaine abuse[.]" (Pl.'s Ex. 19 at 4).

Officer Vallin came to the hospital to interview the plaintiff, as he would do for any person
apprehended by his K-9. (Pl.'s Ex. 18 at 36). The purpose of the interview was to ask the plaintiff
for his version of what happened. (Pl.'s Ex. 18 at 37). The plaintiff, however, ignored most of
Officer Vallin's questions. (Pl.'s Ex. 18 at 38). Officer Vallin took notes of his attempt to interview
the plaintiff and included them in his supplemental report. (Pl.'s Ex. 18 at 39).

When asked why he was hiding in a closet, the plaintiff denied that he had been hiding, but
rather stated that he had been simply "looking around." (Pl.'s Ex. 1-A). He did not answer when
asked why he had been in a home that was not his, especially given that the owner did not know
him, and he did not answer when Officer Vallin asked him whether he had heard him say that a
dog would be used to search the location. (Pl.'s Ex. 1-A). When asked if he had consumed any
narcotic substance, the plaintiff responded, "[Y]es, tonight cocaine[,]" and when asked how much
cocaine he ingested, "[H]e stated belligerently[,] 'enough to [ ] feel your fucking dog bite me.'"
(Pl.'s Ex. 1-A). Officer Pellicone's report noted: "All three suspects admitted to using PCP before
said incident occurred." (Pl.'s Ex. 6).

The plaintiff was issued a misdemeanor summons for second degree criminal trespass and
interfering with an officer. (Pl.'s Ex. 6, 24). The case was ultimately dismissed. Subsequently, in
unrelated cases, the plaintiff was convicted of seven separate burglary charges related to incidents

that occurred on September 20, 2014, October 14, 2014, October 16, 2014, November 4, 2014, November 11, 2014, November 27, 2014, and December 13, 2014.[3] (Def.'s Ex. 3).

II. CONCLUSIONS OF LAW

The following constitutes the Court's conclusions of law pursuant to Fed. R. Civ. P. 52(a)(1):

On November 21, 2014, the defendants responded to a forced entry complaint at 65 Blake Street in New Haven, Connecticut. At all relevant times, defendants Lars Vallin and Eric Pesino were police officers employed by the New Haven Police Department and were acting within the scope of their employment. At all relevant times, the defendants were acting under color of law.

A. EXCESSIVE FORCE CLAIM – LARS VALLIN

As the United States Supreme Court has made clear, "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, . . . of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard. . . ." *Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) (emphasis in original). "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent of motivation." *Id.* at 397 (citations omitted).

The determination of whether law enforcement officers' actions satisfy the objective reasonableness standard "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at

---

[3] The plaintiff was sentenced to concurrent terms of five and seven years' incarceration for these cases. He was arrested for these seven, separate cases on various dates in 2015 and convicted of the offenses on May 18, 2016. (Def.'s Ex. 3). This evidence was offered and received for the sole purpose of weighing the plaintiff's credibility under Fed. R. Evid. 609.

stake." *Id.* at 396. Accordingly, all of the facts of the case must be considered, "including the severity of the crime, whether the arrestee posed an immediate threat to the safety of others, and whether he actively resisted the arrest." *Ramos v. Town of E. Hartford*, No. 3:16 CV 166 (VLB), 2019 WL 2785594, at *7 (D. Conn. July 2, 2019) (citing *Graham*, 490 U.S. at 396) (additional citation omitted). Moreover, the "reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97 (citation omitted); *see also Brown v. City of New York*, 798 F.3d 94, 100-03 (2d Cir. 2015) (discussing Fourth Amendment standard for excessive force claims). "Accordingly, police receive a fairly wide zone of protection in close cases involving potential danger, emergency conditions, and other exigent circumstances." *Thompson v. City of Meriden*, No. 3:94 CV 1950 (EBB), 1999 WL 301693, at *6 (D. Conn. Apr. 14, 1999) (citation omitted).

Applying the *Graham* factors to this case, the Court concludes that the plaintiff has not proven by a preponderance of the evidence that the force used by defendant Vallin was excessive.

As to the first factor, the crime that Officer Vallin was investigating was a burglary in progress. Officer Vallin testified that burglaries in progress were among the more dangerous crimes he responded to because it is presumed that the burglary suspect is armed. Officer Vallin explained that he was called to the scene of this incident with his K-9 dog due to the nature of the crime in progress. Additionally, given Ms. Rivera's "extremely fearful" demeanor, Officer Vallin had "every reason to believe there was someone hiding" inside who may be armed. (Pl.'s Ex. 18 at 17). Accordingly, he approached the plaintiff with a sense of urgency because, based on his

seven years' experience as a dog handler, the circumstances presented by Ms. Rivera were "very concerning" and posed an "officer safety issue." (*See* Pl.'s Ex. 18 at 16-17). Indeed, as Officer Vallin explained, when he arrived at the scene of the reported burglary in progress, he immediately learned that his fellow officers had a suspect in custody, and his continued involvement in the investigation occurred only after Ms. Rivera approached him, insisted that there was an unknown male hiding in her apartment and asked that he help her by locating and confronting that individual.

As to the second factor, whether the suspect poses an immediate threat to the safety of the officer or others, the Court concludes that, under the circumstances at the time Officer Vallin released the K-9 dog, he reasonably believed that the plaintiff was attempting to flee, and he could not determine if the plaintiff was armed. While Officer Vallin's testimony was not clear as to the sequence of events that happened five years prior, the Court credits the account detailed in his police report which he wrote just hours after the incident. (*See* Pl.'s Ex. 1-A).

According to his report, after Officer Vallin called out that the police were present and that the K-9 dog would be deployed and would likely bite, he saw the plaintiff "suddenly appear[]"; he "looked to his left down a hallway and suddenly began to run towards a backdoor exit." (Pl.'s Ex. 1-A). Thus, it was reasonable for Officer Vallin to think that the plaintiff, who may be armed, would attempt to flee through the rear stairwell where he could encounter other officers, putting them in danger.

Although there were many officers on the scene, at the time that the plaintiff first appeared on the second floor, Officer Vallin was alone, facing the plaintiff. (Pl.'s Ex. 1-A ("I was solo at this time aside from my patrol K-9.")). Because "time was of the essence to prevent [the plaintiff] from fleeing the apartment[,]" as soon as Officer Vallin saw the plaintiff look and move in the direction of the rear stairwell, he released Xander. As the plaintiff turned to run, Xander

apprehended him in his buttocks. Officer Pesino arrived and "took hold of" the plaintiff. Officer Vallin commanded Xander to stop apprehending the plaintiff as Officer Pesino began to apply handcuffs.

The plaintiff claims that he was tackled from behind by Officer Pesino in the stairwell area, then dragged into the kitchen area where Officer Pesino placed his hands in handcuffs behind his back, at which time Officer Vallin released Xander and the dog began chomping and biting his legs and buttocks. This testimony was not credible for several reasons.

First, the plaintiff suffered no injuries to his legs and only superficial injuries to his buttocks which would not be reflective of repeated biting and chomping by a highly trained K-9 dog.[4] (*See* Pl.'s Ex. 10). Second, the plaintiff suffered no injuries at all to his hands, though he claimed they were handcuffed behind his back and below his waist while Xander was biting him on the buttocks. Third, although Officer Pesino remembered very little about the event during his testimony, he did recall, consistent with his deposition testimony, that he arrived at the "tail end" of the confrontation to place the plaintiff in handcuffs. Officer Pesino did not see Xander at all, let alone witness him biting the plaintiff, which corroborated Officer Vallin's testimony that he ordered Xander to release as soon as he observed Officer Pesino lay hands on the plaintiff. Officer Pesino explained that he would not get involved with a suspect while a K-9 was apprehending him. (*See* Pl.'s Ex. at 11). Fourth, Officer Vallin testified credibly about Xander's extensive training,[5] including that he had been taught to bite the buttocks and not the legs and that he would not be deployed when

---

[4] Officer Vallin testified that, in addition to the 16-week K-9 training course, the New Haven Police Department held continuing training, usually every week, and Officer Vallin attended seminars and conferences on K-9 training. He re-certified Xander each year, and trained Xander at home, emphasizing obedience and control. Officer Vallin characterized Xander as "very, very reliable" and his success rate as excellent. Officer Vallin and Xander won K-9 Handler of the Year two years in a row from the State of Connecticut, both in 2014 (the year of this incident) and 2015. There were 300 or 400 teams competing for this award, which was chosen by Connecticut police chiefs.

[5] *See* note 4 *supra.*

officers were engaged with a suspect because the K-9 cannot distinguish between a suspect and an officer. Fifth, the medical records reflect that the plaintiff used PCP and cocaine hours before this incident and required a four-hour sobriety hold when he arrived at the emergency department after the incident.[6] (Pl.'s Ex. 19; *see* Pl.'s Ex. 6 ("All three suspects admitted to using PCP before said incident occurred.")). Other than the few details surrounding his interaction with Xander, the plaintiff remembered little about the evening. And finally, the plaintiff was attempting to evade arrest by fleeing. When the police arrived, the plaintiff claims that Ms. Sanchez said she would go speak to them to explain that they were in her house. To exit out of the front of the house, Ms. Sanchez had to go down a flight of stairs from the attic, then cross through the second floor living area and go down the front stairs. The plaintiff and Ms. Wright did not join her. According to the plaintiff, he and Ms. Wright ran down the same back stairwell they had just entered. Yet, given the timeframe and sequence of events, it is clear that they did not exit the house through the back entrance.

If Ms. Sanchez encountered the police on her way out of the house, there is no reason why the plaintiff would have made it through the second floor without encountering the police as well, unless he was hiding. Ms. Sanchez was detained while leaving through the second floor, yet Officer Pellicone reported that the officers "did not find any other subjects." (Pl.'s Ex. 6 ("Upon going up to the 3rd floor[,] [o]fficers met with Ms. Sanchez but did not find any other subjects.")). The officers detained Ms. Sanchez "while [they] searched for the other subjects." (Pl.'s Ex. 6). Ms. Rivera did not report that someone was still hiding inside until after Ms. Sanchez was outside, detained by the police. Given the passage of time, the reasonable inference is that the plaintiff must have been hiding somewhere on the second floor, which is consistent with Officer Vallin's

---

[6] Despite this evidence, when asked at the trial, "Were you high?" the plaintiff responded, "[n]o, we was sober. We was real sober." According to the plaintiff, he "probably used cocaine earlier in the day."

testimony and report, as well as Officer Pellicone's report. (Pl.'s Ex. 1-A, 6). Moreover, although the plaintiff testified that Ms. Wright "took off downstairs[,]" after the plaintiff was detained, Ms. Wright was detained on the second floor where she, too, was hiding in the second floor apartment. (*See* Pl.'s Ex. 6 ("After detaining Mr. Woodhouse[,] [o]fficers then met with an unknown female subject, later identified as Ayeshia Wright, who was also in the rear of Ms. Rivera's apartment."); Pl.'s Ex. 1-A ("[Officer] Pes[]ino also apprehended a[n] unidentified female that has also apparently been hiding with this male.")).

The Court finds credible Officer Vallin's testimony that, after he announced a warning that he would release the K-9 dog, the plaintiff appeared from where he had been hiding and then turned to run to the stairwell. As discussed above, Officer Vallin saw the plaintiff look "to his left down a hallway and suddenly began to run towards a backdoor exit." (Pl.'s Ex. 1-A). Officer Pellicone's report explains that "the rear of Ms. Rivera's apartment [was] open and accessible, by way of a single door frame, to the common rear stairwell of the house." (Pl.'s Ex. 6). Thus, it was reasonable that Officer Vallin feared the plaintiff would attempt to flee through the rear stairwell and out the backdoor exit. Moreover, the location of the lacerations on his buttocks suggest that he was bitten while attempting to flee, rather than that the dog apprehended his legs and buttocks once he was already on the floor. Additionally, the Court credits Officer Vallin's testimony that Officer Pesino detained the plaintiff almost "immediately" after Xander apprehended the plaintiff, and that, once Officer Pesino was involved, Officer Vallin commanded Xander to stop and come back to him.

Officer Vallin's decision to deploy the dog was reasonable under the totality of the circumstances. Pursuant to the New Haven Police Department, General Order 452, governing the Police Service Dog Program, effective January 12, 2012:

> A patrol K-9 dog may be used to locate and apprehend a suspect if the police service dog handler reasonably believes that the individual has either committed or threatened to commit any serious offense and if any of the following conditions exist:
>
> 1. There is a reasonable belief that the individual poses an imminent threat of violence or serious harm to the public, any officer, or the handler;
>
> 2. The individual is physically resisting or threatening to resist arrest and the use of a patrol K-9 dog reasonably appears to be necessary to overcome such resistance;
>
> . . .
>
> 3. It is recognized that situations may arise that do not fall within the provisions set forth in this policy. In any such case, a standard of objective reasonableness shall be used to review the decision to use a patrol K-9 dog in view of the totality of circumstances.
>
> . . .

(Pl.'s Ex. 9). At the time of this incident, Officer Vallin was informed that there was a burglary in progress; a distraught woman reported that a male was still hiding in her home; and, when the plaintiff appeared, he turned to flee down a back stairwell. Officer Vallin's split-second judgment was made under exigent circumstances, and the entire incident occurred in less than three minutes. The Court will not judge this conduct with "the 20/20 vision of hindsight[.]" *See Graham,* 490 U.S. at 396 (citation omitted) (holding that the "reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."). Officer Vallin's decision to deploy the K-9 police dog was "objectively reasonable in light of the facts and circumstances confronting [Officer Vallin] without regard to [his] underlying

intent or motivation." *Nimely v. City of New York*, 414 F.3d 381, 390 (2d Cir. 2005) (citation, internal quotations & footnote omitted).

Moreover, although the plaintiff argues that he was invited to the home by Ms. Sanchez, and he knew Ms. Rivera from years earlier when he dated Ms. Sanchez in 2000, there is no evidence that Ms. Rivera recognized or knew the plaintiff on the night of this incident. (*See* Pl.'s Ex. 6 ("Ms. Sanchez was detained while we searched for the other subjects." "Ms. Rivera stated to Officer Vallin that there was an unknown subject in the rear of her apartment on the 2nd floor." "Upon detaining the both subjects[,] Ms. Rivera stated that she did not know either of them.")). Even the plaintiff's testimony that Ms. Rivera told Officer Vallin that "there's two people in my back hallway right there[,]" does not carry any implication that she knew the plaintiff, particularly when she called the police to report a forced entry involving the plaintiff. The plaintiff claims he was not arrested, but he was issued a summons for Second Degree Criminal Trespass in violation of Section 53a-108 of the Connecticut General Statutes, and Interfering with an Officer, in violation of Section 53a-167a of the Connecticut General Statutes. (Pl.'s Ex. 24).

Thus, under the circumstances of this case, the plaintiff has not established by a preponderance of the evidence that Officer Vallin's actions constituted excessive force.

B. FAILURE TO INTERVENE – ERIC PESINO

The plaintiff's claim against Officer Pesino rests in a failure to intervene. Police officers "[have] an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in [their] presence by other officers." *See O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988) (multiple citations omitted). "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, (2) that a citizen has been unjustifiably

arrested, or (3) that any constitutional violation has been committed by a law enforcement official." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir.), reh'g denied, 27F.3d 29 (2d Cir. 1994) (internal citations omitted); *see also Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001). However, "[i]n order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring." *Anderson*, 17 F.3d at 557 (citing *O'Neill*, 839 F.2d at 11-12).

"Further, '[a] police officer cannot be held liable in damages for failure to intercede unless such failure permitted fellow officers to violate a suspect's 'clearly established statutory or constitutional rights' of which a reasonable person would have known.'" *Whitfield v. City of Newburgh*, No. 08 CV 8516 (RKE), 2015 WL 9275695, at *23 (S.D.N.Y. Dec. 17, 2005) (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Accordingly, a claim of failure to intervene is "contingent upon the disposition of the primary claims underlying the failure to intervene claim." *Whitfield*, 2015 WL 9275695, at *23 (quoting *Usavage v. Port Auth. of N.Y. & N.J.*, 932 F. Supp. 2d 575, 599 (S.D.N.Y. 2013)) (additional citation & internal quotation omitted).

As an initial matter, the failure to intervene claim fails here in light of the Court's conclusion that Officer Vallin did not use excessive force. Notwithstanding that holding, there is also no credible evidence that the plaintiff was being bitten while Officer Pesino was handcuffing him, or that Officer Pesino was in a position to prevent Xander from biting the plaintiff. (*See* Pl.'s Ex. 17 at 11). For the reasons explained above, as to the sequence of events, the Court credits the officers' testimony over the plaintiff's testimony. Officer Pesino testified at his deposition that he placed the plaintiff in handcuffs, but he explained: "[N]aturally I wouldn't apply cuffs if there was a K-9 in the presence. I wouldn't get involved in that." (*Id.*). Officer Pesino and Officer Vallin both testified that the plaintiff was apprehended by Xander first. Then, according to Officer Vallin,

Officer Pesino handcuffed the plaintiff, at which point Officer Vallin used the command for Xander to release the plaintiff. (*See* Pl.'s Ex. 17 at 27-28; Pl.'s Ex. 1-A). The entire sequence of events occurred in mere minutes. The plaintiff has not established by a preponderance of the evidence that Officer Pesino failed to intervene.

III. <u>CONCLUSION</u>

Accordingly, for the reasons stated above, the Clerk shall enter judgment in favor of the defendants Lars Vallin and Eric Pesino.[7]

Dated at New Haven, Connecticut, this 28th day of September, 2019.

                                                    /s/ Robert M. Spector
                                                    Robert M. Spector
                                                    United States Magistrate Judge

---

[7] The Court thanks Attorney James Nealon for his thorough and zealous advocacy on behalf of the plaintiff. The Court is appreciative of his *pro bono* service.